LUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK WELCH, III,

       Plaintiff,                           Civil Action No. 14-10654

v.                                    HON. MARIANNE O. BATTANI
                                       U.S. District Judge
                                       HON. R. STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Frank Welch, III ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #22] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

## PROCEDURAL HISTORY

On July 11, 2012, Plaintiff filed an application for SSI, alleging an onset of disability date of January 1, 2008 (Tr. 118). After the initial denial of the claim, Plaintiff requested an administrative hearing, held on June 25, 2013 in Lansing, Michigan (Tr. 27). Administrative

Law Judge ("ALJ") B. Lloyd Blair presided. Plaintiff, represented by Clifford Walkon, testified, (Tr. 31-44), as did Vocational Expert ("VE") Lois Brooks (Tr. 44-48). On July 11, 2013, ALJ Blair determined that Plaintiff was not disabled (Tr. 21-22). On January 13, 2014, the Appeals Council denied review of the claim (Tr. 1-5). Plaintiff filed for judicial review of the final decision on February 12, 2014.

## BACKGROUND FACTS

Plaintiff, born September 22, 1972, was 40 when the ALJ issued his decision (Tr. 22, 118). His application for benefits alleges disability as a result of headaches, vision and memory problems (Tr. 168).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony.

He currently lived in Detroit, Michigan (Tr. 31). He left school after 10th grade but later completed a GED (Tr. 31). He stood 5' 8" but did not know how much he weighed (Tr. 31). He never held a driver's license (Tr. 31). He last worked as a laborer but held the job for only three months (Tr. 32). He was unable to work due to bipolar disorder, a major depressive disorder, and the complete loss of vision in the left eye and partial loss in the right eye (Tr. 32). The vision in his right eye was becoming progressively worse to the point that he could only see objects directly in front of him (Tr. 32). He experienced daily headaches due to bullet fragments lodged in his head during a 1990 incident (Tr. 33).

Plaintiff currently received medication checks by a psychiatrist once a month and saw

a counselor twice a month (Tr. 33-34). He took Seroquel and Cymbalta for the psychiatric conditions (Tr. 34). He experienced the medication side effects of irritability and agitation (Tr. 34). He received emergency room treatment for headaches earlier in the year (Tr. 35). He experienced minimal results from over-the-counter headache medication (Tr. 35). He coped with headaches with a hot compress (Tr. 35). He did not use illegal substances (Tr. 35). He did not use alcohol at present, but drank beer in the past (Tr. 36). He smoked one pack of cigarettes each day (Tr. 36). He divorced from his wife earlier in the year but continued to live with the former wife, his stepdaughter, and four-year-old daughter (Tr. 36). His meal preparation was limited to making sandwiches (Tr. 36). His former wife did most of the laundry and shopping chores (Tr. 37). He did not perform yard work (Tr. 37). He did not have friends and did not visit with relatives (Tr. 37). He recently attended his daughter's preschool graduation ceremony (Tr. 37). He belonged to a church but did not attend often (Tr. 38). He watched televised religious services on Sunday morning (Tr. 38).

Plaintiff typically arose early to take his medication but was ready for a nap by 11:00 a.m. (Tr. 38). He would arise at about 3:00 p.m. but required another nap by 7:00 p.m. (Tr. 38). He attributed his erratic sleeping habits to the psychotropic medication (Tr. 38). He did not experience problems squatting and could lift at least 10 pounds (Tr. 38). He was unable to stand for more than five minutes before experiencing dizziness (Tr. 39). He did not "do too much walking" and did not know how long he could sit while awake, adding that he had no problem remaining in a sitting position while sleeping (Tr. 39).

-3-

In response to questioning by his attorney, Plaintiff reported that he received his GED while in prison (Tr. 40). He was awarded SSI benefits from March to October, 2009 but the benefits ceased when he was incarcerated in October, 2009 (Tr. 40). Due to vision problems in the right eye, he had to "get close" to the screen while watching television (Tr. 40). He attributed his headaches, in part, to eye strain (Tr. 41). He experienced severe headaches at least five times a week lasting up to three hours (Tr. 41-42). He had been living with his former wife for approximately six months (Tr. 42). Despite the use of psychotropic medication, he experienced some level, albeit reduced, of anxiety (Tr. 43). In the past, his failure to take the prescribed psychotropic medication resulted in symptoms requiring inpatient hospitalization (Tr. 43-44).

**B.    Medical Evidence[1]**

**1. Treating Sources**

In April, 2009, Plaintiff was hospitalized for one week after a family member prevented him from stabbing himself (Tr. 545). He was given a guarded prognosis (Tr. 546). August, 2009 mental health treatment records show that Plaintiff was jailed for violating the terms of parole (Tr. 273). A September assessment noted that Plaintiff's "assets" were his work ethic and  devotion to family and his "limitations" were left eye blindness and a

---

[1]Plaintiff's arguments pertain exclusively to whether the ALJ erred by discounting the claims of right eye vision limitations. While the medical transcript has been reviewed in full, the records pertaining to the psychological conditions are mostly omitted from the present discussion.

criminal record (Tr. 244).   November, 2009 jail records state that Plaintiff was currently suicidal (Tr. 242, 262).  Nursing staff noted that he reported partial blindness in the right eye (Tr. 262).  He was not referred for an eye examination (Tr. 224).  April, 2010 records state that Plaintiff refused an offer to have his right eye examined (Tr. 320).  At a subsequent examination, Plaintiff was able to see "hand motion only" (Tr. 317).  The examiner opined that Plaintiff required "further neurological evaluation to determine why  [his] vision [was] so poor" (Tr. 314, 317).  The eye exam showed an otherwise unremarkable right eye (Tr. 314).  In May, 2010, Plaintiff complained that he was kited for arriving late for his work shift in the prison kitchen (Tr. 446).  In July, 2010, Plaintiff rejected further recommendations for eye exams (Tr. 481).  Case management notes from the same month note that Plaintiff was agitated with an inflated sense of entitlement but made appropriate eye contact (Tr. 482).

January and June, 2011 Michigan Department of Corrections ("MDOC") physical examination records note "profound" impairment of both eyes (Tr. 329, 349).  In July, 2011, Plaintiff reported right eye irritation after accidentally spraying himself with disinfectant while trying to spray a mosquito in the window (Tr. 353).  August, 2012 psychological treating records following Plaintiff's release from prison show that he made good eye contact (Tr. 538).

### 2.  Other Sources

In December, 2008, Cynthia Shelby-Lane, M.D. performed a consultative physical examination, noting Plaintiff's reports of left eye blindness and double vision in the right eye

(Tr. 195). Plaintiff stated that he had not "attempted brail," or used a seeing eye dog or white cane (Tr. 195). He reported that he had completed an associate's degree (Tr. 196, 261). Dr. Shelby-Lane noted that the right eye was reactive to light (Tr. 197). Plaintiff demonstrated a normal gait and 20/200 uncorrected vision on the right (Tr. 197). Dr. Shelby-Lane concluded that Plaintiff's vision problems would "limit any repetitive work and working on heights" (Tr. 198).

In February, 2009, Nick Boneff, Ph.D. performed a consultative psychological examination, noting Plaintiff's report that he was released in 2007 after a 17-year prison stint (Tr. 205). Plaintiff reported that he now refrained from playing basketball due to his fear of losing sight in the right eye (Tr. 206). Dr. Boneff reported that Plaintiff found the need to answer questions "onerous," and began "screaming" during the course of the examination (Tr. 206). He refused to answer additional questions, and eventually "stormed out" of the uncompleted interview (Tr. 206).

The following month, ophthalmologist Gamil Soliman, M.D. performed an eye exam, noting Plaintiff's claim that he was unable to see "anything but hand movements with corrective lenses" (Tr. 211). Dr. Soliman noted that the [v]ision field could not be taken" due to Plaintiff's claim that he was unable to see "the test target" (Tr. 212). An examination of the right eye was essentially unremarkable (Tr. 212). Dr. Soliman observed that despite Plaintiff's alleged inability to see, he was able to walk "unaided" and could see "surrounding objects" (Tr. 212). Dr. Soliman remarked that the "[p]ossibility of malingering cannot be

ruled out" (Tr. 212).

In September, 2012 ophthalmologist Daniel S. Zuckerbrod, M.D. examined Plaintiff

on behalf of the SSA, noting vision of 20/400 (corrected and uncorrected) at 14 inches (Tr.

524). He observed, however, that the alleged "loss of vision and absence of a visual field on

the right side" were "not supported by the examination" (Tr. 524). Dr. Zuckerbrod observed

that Plaintiff was able to ambulate well and avoid hazards (Tr. 524). The same month, L.

Imasa, M.D. conducted a consultive examination, finding the presence of a major depressive

disorder with psychotic features (Tr. 529). She noted that he came to the appointment alone

(Tr. 528).

### C. Vocational Expert

VE Lois Brooks classified Plaintiff's former work as a laborer as exertionally light

and unskilled and work as a sorter as sedentary/unskilled [2] (Tr. 45). The ALJ then posed the

following question to the VE, describing a hypothetical individual of Plaintiff's age,

education, and work background:

> Assume a hypothetical individual who can meet the demands of light work and
> the individual should never use ladders, scaffolds or ropes, on occasion use

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds.

ramps, stairs, stoop, kneel, crouch or crawl. He should avoid concentrated
exposure to hazards, including dangerous unprotected machinery or work at
unprotected heights. He should not have objects presented from the left. The
individual has no vision in the left eye. Should have only simple, unskilled
work, with an SVP of 1 or 2, work involving just one, two or three-step
instructions. No jobs involving concentration in detailed or precision tasks,
monitored tasking, reading, computing, calculating or problem solving.
Should have jobs that do not require teamwork or working in close proximity
of coworkers and job requiring just brief or superficial contact with the general
public. In your opinion, would there be a significant number of jobs existing
in the region or national economy that such a person could perform? (Tr. 45).

The VE responded that the above-stated limitations would allow the hypothetical individual
to perform his past relevant work as well as the jobs of cleaner (8,000 jobs in existence in the
southeastern Michigan region); packer (6,500); and laundry laborer (1,800) (Tr. 45). She
stated that her testimony was consistent with the information found in the Dictionary of
Occupational Titles ("DOT") (Tr. 46).

In response to questioning by Plaintiff's counsel, the VE testified that if the
hypothetical individual needed to nap for two or three hours over the course of each workday,
all competitive employment would be precluded (Tr. 46). The VE testified that if the
hypothetical individual were further limited by inability see more than 10 to 12 feet away,
the cleaning and laundry jobs would be eliminated but the packer job numbers would remain
unchanged (Tr. 46). In response to how the job numbers would be affected if the individual
were limited to seeing "finger counting at a quarter foot," the VE stated that she would be
unable to answer the question without more information (Tr. 47-48).

-8-

**D.      The ALJ's Decision**

ALJ Blair found that Plaintiff had not experienced a disability "since July 10, 2012, the date the [SSI] application was filed," noting that he nonetheless considered the medical records from before that date in making his determination (Tr. 10).  Citing the medical transcript, the ALJ found that although Plaintiff experienced the severe impairments of a "bipolar disorder/depression; left eye blindness; and headaches, none of the conditions met or medically equaled one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 (Tr. 12).  The ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in concentration, persistence, or pace (Tr. 13).  Consistent with the hypothetical question to the VE, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [C]laimant can never use ladders, scaffolds, or ropes; can occasionally use ramps or stairs, stoop, kneel, crouch, or crawl; should avoid concentrated exposure to hazards including dangerous and unprotected machinery or work at unprotected heights; should have no objects presented from his left; has no vision in his left eye; requires simple unskilled work with an SVP rating of 1 or 2 and work involving only one, two, or three-step instructions; no jobs involving concentration in detailed/precision tasks or multi-tasking, reading, computing, calculating, or problem solving; jobs that do not require teamwork or close physical proximity of coworkers; and jobs requiring just brief and superficial contact with the public (Tr. 14).

Adopting the VE's job findings, he found that Plaintiff could work as a cleaner, packager, or laundry laborer (Tr. 21).

The ALJ rejected Plaintiff's claim that he was unable to see more than extremely short distances with his right eye (Tr. 15).  The ALJ cited December, 2008 consultative

-9-

examination records showing that Plaintiff had 20/200 vision in the right eye that contrasted

with May, 2010 examination records showing that Plaintiff's vision was limited to discerning

finger movements made three inches from the eye (Tr. 16). The ALJ noted that the May,

2010 records stood at odds with Plaintiff's otherwise unimpaired ability to walk without

problems and avoid hazards (Tr. 16). He cited one examiner who found that "the 'possbility

of malingering cannot be excluded'" (Tr. 16, 212). He also cited Dr. Zuckerbrod's finding

that Plaintiff's claims of the "absence of a visual field on the right side" were not objectively

supported (Tr. 16, 20, 212).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of*

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more

than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.

1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health*

-10-

*& Human Services*, 755 F.2d 495, 497 (6ᵗʰ Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## <u>ANALYSIS</u>

### The Step Two Finding

Plaintiff argues that the ALJ erred by failing to include the condition of right eye vision loss among the "severe" impairments at Step Two of the sequential analysis. *Plaintiff's Brief* at 6-8, *Docket #15.* He contends that the prison treating records, consultative examination findings, and his own testimony largely support a finding of right-sided vision problems. *Id.* He argues that the failure to reference the right-side vision impairment at Step Two tainted the hypothetical question to the VE and the RFC, neither of which contain reference to right-sided vision loss. *Id.*

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir.1985). An impairment can be considered "not severe ... only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'" *Id.* at 90 (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)). A non-severe impairment is defined as one that does not "significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities" include the capacity for "seeing, hearing, and speaking." § 404.1521(b).

At Step Two, the the ALJ acknowledged the condition of left eye blindness, but

declined to accept Plaintiff's allegations of right-sided vision problems (Tr. 12, 15-16).   He

noted the discrepancy between a December, 2008 eye exam showing 20/200 vision in the

right eye with Plaintiff's May, 2010 claim that his vision was limited to seeing "hand motion

at three inches" (Tr. 16).   The ALJ cited two ophthalmologists' observations that despite the

purported visual limitations, Plaintiff was able to ambulate without assistance and . . . was

able to avoid hazards in the environment" (Tr. 16).   The ALJ cited Dr. Zucherbrod's finding

that the supposed "'loss of vision and absence of a visual field on the right side [were] not

supported by the examination" and Dr. Soliman's observation that Plaintiff was possibly

"malingering" (Tr. 20, 212, 524).   The ALJ concluded that Plaintiff's ability "to navigate

even unfamiliar environments without assistance or injury strongly suggests that his vision

in [the] remaining right eye is not as limited as he claims" (Tr. 16).

Substantial evidence supports the ALJ's determination that right eye problems did not

meet even the Step Two *de minimis* standard.   The May, 2010 records note an unremarkable

physical examination of the right eye despite Plaintiff's claim that he was unable to observe

anything but hand motions at three inches (Tr. 314, 317).   Plaintiff's claim that he was unable

to see at a distance of more than three inches stands at odds with records from the same

month stating that he was able to hold a job in the prison kitchen (Tr. 446).   It is unlikely that

he would be capable of holding a kitchen position if he were unable to discern objects at a

distance greater than three inches.   July, 2011 medical records state that he sought treatment

after accidentally spraying himself with disinfectant while trying to kill a mosquito in his cell

(Tr. 353). Plaintiff's ability to observe a mosquito in the window of his cell, as described in the treating records, also undermines his claimed inability to see anything but fingers waved three inches in front of his face (Tr. 353). His ability to attend a September, 2012 consultative psychological examination unaccompanied and treating records showing "good eye contact" cast further doubt on the claim of right-eye blindness (Tr. 482, 528, 538). Plaintiff has not attempted to learn brail or requested the use of a white cane or leader dog as would be expected of an individual with such limitations (Tr. 195).

Plaintiff contends that the ALJ's rejection of the right eye claims is supported solely by Dr. Zuckerbrod's opinion. *Plaintiff's Brief* at 7. He cites numerous treating records making reference to the loss of right eye vision. *Id* at 6 (citing 216, 218, 314, 367). However, my own review of these records indicates that the reference to right eye vision problems in the MDOC treating records reflect Plaintiff's subjective claim that he was unable to see more than three inches in front of him. Aside from Plaintiff's claim that he was unable to see much out of the right eye, neither the treating nor consultative records show any objective support for Plaintiff's claim of severe right-sided vision loss.

Plaintiff also argues that the failure to reference the right eye condition at Step Two led to critical omissions in the hypothetical question and the RFC. *Plaintiff's Brief* at 7. However, because the ALJ provided a well supported rationale for his findings regarding the right vision loss, he was not required to include the rejected claims in the hypothetical question to the VE or the RFC found in the administrative opinion (Tr. 15-16, 20). *See*

-14-

*Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir.1994) (ALJ not obliged to include discredited allegations among the limitations posed to the VE). Notably, both the hypothetical question and RFC generously accommodate Plaintiff's limitations as a result of left-side blindness by precluding work involving hazards, dangerous machinery, unprotected heights, and working with "objects presented from the left" (Tr. 14, 45)

Even assuming that Plaintiff experienced some degree of right vision loss, the ALJ's Step Five finding that Plaintiff was capable of a significant range of unskilled work is supported by substantial evidence. While the ALJ's question to the VE did not reference right eye problems, the VE testified that if the hypothetical individual were limited by the inability to see more than 10 to 12 feet, he would nonetheless be capable of performing the job of packer (6,500 jobs in the regional economy) (Tr. 46). Aside from Plaintiff's professed severe vision loss, none of the objective evidence or observations support the conclusion that he was unable to see 12 feet in front of him. Standing alone, the 6,500 packer jobs constitutes a "significant number" for purposes of a Step Five analysis. *See Born v. Secretary of Health & Human Services,* 923 F.2d 1168, 1174 (6th Cir.1990) (*citing Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir.1988)) (1,350 jobs in the local economy constitute a significant number); *Martin v. Commissioner of Social Security,* 170 Fed.Appx. 369, 375, 2006 WL 509393, *5 (6th Cir. March 1, 2006) (870 jobs in the claimant's geographic region a significant number). For these reasons, the lack of reference to right eye problems at Step

-15-

Two does not constitute grounds for remand.

Because the ALJ's decision was well articulated and easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court.   *Mullen v. Bowen*, *supra*.

## CONCLUSION

Accordingly, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall

-16-

address specifically, and in the same order raised, each issue contained within the objections.


                                        s/R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

Dated: January 21, 2015



## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 21, 2015, electronically and/or by U.S. mail.

                                        s/Carolyn M. Ciesla
                                        Case Manager